IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| BOARD OF REGENTS, | § | |
| THE UNIVERSITY OF TEXAS SYSTEM, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. A-11-CA-125-LY |
| | § | |
| TOWER CAR WASH, INC, D/B/A | § | |
| TOWER EXPRESS CAR WASH, ROBERT | § | |
| E. TESCH, AND TESCH & ASSOCIATES, INC., | § | |
| DEFENDANTS. | § | |

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Before the court in the above styled and numbered cause are Plaintiff Board of Regents, The University of Texas System's (the "University") Plaintiff's Motion For Summary Judgment filed February 29, 2012 (Clerk's Document No. 36), Defendants Tower Car Wash, Inc., d/b/a Tower Express Car Wash, Robert E. Tesch, and Tesch & Associates, Inc.'s (collectively "the Car Wash") Response to Plaintiff's Motion for Summary Judgment filed March 10, 2012 (Clerk's Document No. 40), and Plaintiff's Reply To Defendants' Response To Plaintiff's Motion For Summary Judgment filed March 26, 2012 (Clerk's Document No. 41). The University contends that because trademark and unfair competition law prohibit the false or misleading suggestion of affiliation or sponsorship, the University is entitled to summary judgment on its claims of trademark infringement and dilution, unfair competition, and unjust enrichment alleged against the Car Wash. Having considered the motion, response, reply, the case file, and the applicable law, the court will grant the motion.

**Background**

Defendant Robert Tesch, who was born in Texas and has been a real estate developer for over 30 years, graduated from the University in 1965. After researching the viability of a car-wash business and after attending the Car Wash College, he built the Car Wash in Cedar Park, Texas, which is 20 miles from the University's Austin, Texas campus. As he is a lifelong fan of the University, he included a 60-foot replica of the University of Texas tower ("tower replica") at the Car Wash. To promote the car-wash products and services, the Car Wash operates under the mark "Tower Express Car Wash", the trade name "Tower Car Wash, Inc.", and the website www.towerexpresscarwash.com. The Car Wash claims that the tower replica "serve[s] as a homing beacon to all unwashed vehicles." The tower replica is virtually identical in appearance to the actual tower on the University's Austin campus. The tower replica is equipped with a lighting system so that it can bathe both the upper and lower portions of the structure with colored lights, including orange, similar to the University tower. Additionally, the Car Wash features an abstract of the University tower in the color orange as the "T" in the Tower Express Car Wash logo that is displayed on the Car Wash's website and in promotional materials. Additionally, the Car Wash is using the tower replica and logo in commerce.

The University operates an extensive trademark-licensing program, by which it licenses its trademarks and service marks under controlled conditions for use in connection with a wide range of products and services sold to the public. Since at least 1971, the University has used various marks depicting the University tower ("tower marks") in connection with educational services and athletic programs as well as on various products and services. The University owns four federal trademark registrations and one Texas trademark registration. The tower marks have been used and

licensed in connection with numerous products and services over the years, including but not limited to credit union services, brochures, bags, mugs and cups, media guides, t-shirts, retail store services, framed photographs, alumni materials, snow globes, paintings, television network services, calendars, and featured most recently on water bottles. The University licenses its marks to an array of service-oriented businesses, such as "Longhorn Energy," and offers unique sponsorships with such businesses. The Car Wash is not affiliated with or sponsored by the University nor has it been authorized by the University to use any of the tower marks.

On October 12, 2010, the University sent Tesch an objection letter and demanded that he immediately dismantle the tower replica and remove all references to it from the Car Wash website. Tesch entered into negotiations with attorneys for the University and proposed design changes to the tower replica. By a December 8, 2010 email, the University's counsel agreed to a proposed design change, which modified the roof portion of the tower replica and provided that no orange lighting could be used. However, by a December 13, 2010 email from the University's attorney to Tesch, the University noted that Tesch had proceeded to open the Car Wash before first resolving the dispute and noted that there had been extensive press coverage about the Car Wash. The December 13 email to Tesch from the University's counsel provided,

> The situation has changed dramatically since we began discussing possible resolution of this dispute. Not only did you proceed to open your business before first resolving this dispute, but (as I'm sure you know) there has been extensive coverage in the press about this matter over the past few days, including at least one newspaper article, TV news report, radio talk shows, etc. Your business has no doubt benefitted greatly from this publicity–it has also cemented the public association between your tower and UT's tower. For these reasons, the changes we have been discussing are no longer acceptable to UT. At this point we feel you must make more

>significant changes to your tower to remove the association you have already created in the public's mind with UT's tower.

The email continued and provided that without modifications, the University would "consider further steps, including filing suit and asking the Court to order you to remove the tower (among other relief)." Specifically, the University demanded that Tesch modify the tower replica to remove the columns and clock portions, cover up all windows on the lower portion of the replica so that all four sides are smooth, and paint the lower portion a color other than orange or white.

Tesch declined to make these modifications, and the University filed this action. The University alleges, *inter alia*, that the Car Wash is engaging in unauthorized use of the tower replica and the Car Wash's logo. The University alleges that both the replica and logo are likely to cause confusion, mistake, or deceive customers to wrongly believe that there exists at least some affiliation, connection, or association of the Car Wash with the University. Additionally, the Car Wash's actions will cause its customers confusion as to the origin, sponsorship, or approval of the Car Wash's products and services by the University. The University argues that the Car Wash's use of the tower replica and the logo enables the Car Wash to trade on and receive the benefit of goodwill built up at the labor and expense of the University over many years. Further, the University argues that the unauthorized use of the replica and logo is likely to dilute the distinctive quality of the tower marks.

4

The University alleges claims against the Car Wash of federal trademark infringement, federal unfair competition, infringement under Texas law, common-law trademark infringement, common-law unfair competition, dilution under Texas law, and unjust enrichment.[1]

The Car Wash disputes the University's allegations, and responds that the University is not entitled to any trademark rights in the University tower, because the University tower is a public building that symbolizes the City of Austin, or alternatively, that the University has abandoned any rights it may have had in the University tower. Further, the Car Wash contends that as all of the University's trademark registrations and any common-law trademark rights are all in the area of education and related services, the Car Wash is a business outside of any competition with the University, and there is no possibility that consumers will be confused by the Car Wash's activities. Further, the Car Wash argues that the extensive use of disclaimers and public information will prevent any possible confusion by consumers about any sponsorship or affiliation of the Car Wash with the University. Additionally, the Car Wash contends that there is no likelihood of dilution under Texas law and that "[e]quity demands that Car Wash's business proceed unhindered by [the University's] aggressive and litigious behavior seeking to assert rights in public property while claiming unproven and purely theoretical damages."

---

[1] The University alleges that the Car Wash's actions constitute infringement of the University's federally registered tower marks and unfair competition. *See* 15 U.S.C. §§ 1114(1), 1125(a). Additionally, the University alleges that the Car Wash's actions constitute trademark infringement of the University's state registered tower mark. *See* Tex. Bus. & Com. Code Ann., § 16.26 (West 2011). The University also alleges that the acts of the Car Wash constitute dilution of the University's tower marks. *See* Tex. Bus. & Com. Code Ann. § 16.29 (West 2011). Finally, the University alleges that the Car Wash has been unjustly enriched at the expense of the University.

After the University sued the Car Wash in February 2011, Tesch altered the top portion of the tower replica and contends that it now substantially complies with the University's counsel's representation in the December 8, 2010 email. Further, Tesch represents that to date the Car Wash has yet to be lighted orange. The University, however, continued with this proceeding, and now moves for summary judgment on all of its claims alleged against the Car Wash.

**Summary-judgment standard**

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). If the moving party carries its burden of showing that there is no genuine dispute as to any material fact, the burden shifts to the nonmovant to introduce specific facts or produce proof that shows the existence of a genuine dispute regarding a material fact that prevents the grant of summary judgment in the movant's favor. Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 322-23. A dispute regarding a material fact is "genuine" if the proof is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no proof to support the nonmoving party's case, the party opposing the motion must come forward with competent

summary-judgment proof of the existence of a genuine dispute regarding a material fact. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary-judgment proof, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary-judgment proof. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific proof in the record and to articulate the precise manner in which that proof supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n. 7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary-judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

**The law related to University's infringement, unfair competition, and unjust enrichment claims**

An identical standard applies to the University's federal trademark-infringement and unfair-competition claims, Texas trademark-infringement and unfair-competition claims, and unjust enrichment claim. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d at 235 n.7 (5th Cir.

7

2010); *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 547 n.15 (5th Cir. 1998), *abrogated on other grounds, TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001). To prevail on these claims, the University must establish (1) ownership in a legally protectable mark; and (2) infringement of that mark. *See e.g., Amazing Spaces*, 608 F.3d at 235-36.

### *Trademarks*

To qualify as a trademark, the symbols or words at issue must be distinctive. *See e.g., Amazing Spaces*, 608 F.3d at 237. A mark can be distinctive in either of two ways: (1) the mark is inherently distinctive because its intrinsic nature serves to identify a particular source, or (2) the mark has acquired distinctiveness through the development of secondary meaning. *Id.; see also Pebble Beach*, 155 F.3d at 542-43 (finding lighthouse structure distinctive); *White Tower Sys., Inc. v. White Castle Sys., Inc.*, 90 F.2d 67 (6th Cir. 1937) (finding castle structure protectable). Whether a mark is inherently distinctive and whether it has acquired secondary meaning are questions of fact. *Amazing Spaces*, 608 F.3d at 234. "Nevertheless, summary judgment may be upheld if the summary judgment record compels the conclusion that the movant is entitled to judgment as a matter of law." *Id.*

A mark is inherently distinctive if "its intrinsic nature serves to identify a particular source." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000). "Inherent distinctiveness is attributable to a mark when the mark 'almost automatically tells a customer that it refers to a brand and ... immediately signal[s] a brand or a product source.'" *Amazing Spaces*, 608 F.3d at 240 (quoting *Qualitex Co. v Jacobson Prods. Co.*, 514 U.S. 159, 162-63 (1995)).

A mark may acquire a secondary meaning "when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Id.*

(quoting *Wal-Mart Stores*, 529 U.S. at 211). "Secondary meaning is used generally to indicate that a mark . . . has come through use to be uniquely associated with a specific source." *Amazing Spaces*, 608 F.3d at 247. Because the primary element of secondary meaning is a mental association in buyers' minds between the alleged mark and a single source of the product, the determination whether a mark has acquired secondary meaning is primarily an empirical inquiry. *Id.* at 248.

### *Likelihood of confusion*

Once a mark is determined to be protectable, the touchstone of a trademark-infringement claim is a likelihood of confusion as to the source, affiliation, or sponsorship of the products or services at issue. *See e.g., Board of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008). Proof of actual confusion is not necessary to prove a trademark-infringement claim. All that is required is a likelihood of confusion. Actual confusion is, nevertheless, considered the "best evidence" of the likelihood of confusion. *See, e.g., American Rice, Inc. v. Producers Rice Mill*, Inc., 518 F.3d 321, 333 (5th Cir. 2008); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 46 (5th Cir. 1975) (infringement as matter of law based on four examples of actual confusion).

Among the factors that may be considered by the court when assessing the likelihood of confusion are: (1) the type of trademark infringed; (2) the similarity between the marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media employed; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. *See e.g., Smack Apparel*, 550 F.3d at 478; *Elvis Presley Enters, Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998). No one

factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these "digits of confusion." *See Smack Apparel*, 550 F.3d at 478; *Elvis Presley*, 141 F.3d at 194. Although a precise identity between marks is not necessary for a finding of confusion, "the greater the similarity in the design of the trademarks, the greater the likelihood of confusion." *Exxon Corp. v. Texas Motor Exch., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980); *see also Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 228 (5th Cir. 2009). Additionally, a court may consider other factors, and "different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved." *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir. 1985).

Competition between the parties or between products and services is not required in order to find a likelihood of confusion. *See e.g., Elvis Presley*, 141 F.3d at 202; *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1159 (5th Cir. 1982) (holding likelihood of confusion despite different products and services and different customers); *Professional Golfers Ass'n v. Bankers Life & Cas. Co.*, 514 F.2d 665, 669-70 (5th Cir. 1975). Rather, when products or services are noncompeting, "the confusion at issue is one of sponsorship, affiliation, or connection." *Elvis Presley*, 141 F.3d at 202.

**Analysis**

The University argues that the University tower and the tower marks, in the same manner as the landmarks in *Pebble Beach* and *White Castle*, function as inherently distinctive marks because they intrinsically serve to identify the University campus and "bear no relationship to the products or services to which they are applied." *See Pebble Beach*, 155 F.3d at 540. Without doubt, the tower marks bear no inherent relationship to water bottles, credit union services, t-shirts,

or other products and services licensed by the University. Rather, the tower marks, when applied to products and services, are unexpected arbitrary marks that "automatically tell a customer that they refer to a brand." *Wal-Mart Stores*, 529 U.S. at 212-13; *Amazing Spaces*, 608 F.3d at 243-45, n.13; *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 426 n.7 (5th Cir. 1984) ("In this circuit, sufficiently distinctive trade dress, upon use in the market, is presumed to serve as an identifier of source without proof of secondary meaning.").

The University argues that it's four federal trademark registrations and one state registration of the tower marks are not only *prima facie* evidence of the University's exclusive right to use the marks in connection with the listed products and services, but are also powerful evidence that the tower marks are inherently distinctive because, argues the University, the United States Patent and Trademark Office registered each without requiring any evidence of secondary meaning. *See Amazing Spaces*, 608 F.3d at 238. Further, the University argues that even if the tower marks are not inherently distinctive, they have acquired secondary meaning. *See e.g., Pebble Beach*, 155 F.3d at 541 (factors include length of use, volume of sales, amount of advertising, consumer-survey evidence, and defendant's intent); *cf. Smack Apparel*, 550 F.3d at 476-77 (secondary meaning based on longstanding use, display on merchandise, and intent to copy); *Pebble Beach*, 155 F.3d at 541-42 (secondary meaning based on extensive advertising, unsolicited publicity, and intent to copy).

The Car Wash disputes that the tower marks are protectable arguing that the University has never consistently used the tower as a designation of source. Additionally, the Car Wash responds that any rights the University might have had "have been forfeited due to their reckless sponsorship and license agreements which have further eroded any ability of the Tower to serve a trademark function." Also argues the Car Wash, the "longstanding and high profile third party uses of the

Tower in and around the Austin, [Texas] area illustrate that the Tower is not the [University]'s exclusive property." Also, argues the Car Wash, even if the University does "retain rights to the Tower, there can be no infringement by Tower Car Wash because there is no likelihood of confusion given that the Car Wash is not even remotely a competitor of [the University]."

The court finds the following is undisputed summary-judgment proof: (1) the University tower has served a commanding position in Austin and throughout the state of Texas since 1937; (2) the University has used the tower marks in commerce since at least as early as 1971; (3) the University operates one of the most extensive and successful collegiate trademark licensing programs in the world; (4) use of the tower marks is controlled by extensive graphic identity standards and various licensing agreements; (5) the tower marks have been licensed and used in connection with numerous products and services; (6) the University licenses its marks to an array of service-oriented businesses, such as "Longhorn Energy"; (7) the University has ranked as the top-selling collegiate institution in the nation for the past six years, collecting over $10 million in royalties in 2011.

Additionally, the University includes as summary-judgment proof "an objective survey of the public's perception" of the University tower. *See Amazing Spaces*, 608 F.3d at 248. Such surveys are the "most direct and persuasive way of establishing secondary meaning." *See Sno-Wizard Mfg., Inc. v. Eismann Prods. Co.*, 791 F.2d 423, 427 (5th Cir. 1986). The University's survey establishes that a net of at least 54.1% of relevant consumers in the Austin area associate products and services displaying an image of the University tower solely and exclusively with the University. The court finds that this satisfies the secondary meaning prong of the trademark analysis, as absent is any controverting summary-judgment proof. *See Zatarains, Inc. v. Oak Grove*

*Smokehouse, Inc.*, 698 F.2d 786, 795-96 (5th Cir. 1983) (secondary meaning surveys showing 23% and 28% association rates support finding of secondary meaning).

The Car Wash maintains that there can be no likelihood of confusion because the Car Wash is not a competitor of the University. However, when products are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection. *Elvis Presley*, 141 F.3d at 202. The court finds the argument by the Car Wash that it and the University are in highly dissimilar businesses is unavailing.

The undisputed summary-judgment proof reflects that the Car Wash deliberately copied the University's tower, the tower marks, and the University's color scheme. The undisputed facts are that the Car Wash copied the University's tower marks and color scheme to pay homage to the University and to take advantage of the goodwill developed by the University. Tesch by deposition explained that the replica would cause people to think about the University. A December 16, 2010 newspaper article quoted Tesch, "I wanted to build a building that the community felt good about and was comfortable with, and I came up with the UT Tower likeness." Johnny Johnson, *No UT lawsuit, but local car wash owner getting ready to modify tower*, Hill Country News, Dec. 16, 2010, at 1.

Further, Tesch informed third parties that the University had authorized the Car Wash to build the tower replica, to use the tower marks, and to hand out orange Tower Car Wash business cards with the 2010 University football schedule on the back of the cards. Shawna Sieck was approached by Tesch to develop lighting for the tower replica. By deposition Sieck explained that Tesch told her that he had approval from the University to erect the replica. Also, Felipe Cruz, who was involved in designing the logo for the Car Wash explained by deposition that he thought that

Tesch was associated with the University and thought that Tesch had cleared the design with the University. Further, during the construction phase of the tower replica, one work proposal identified the Car Wash job location site as the "UT Tower Car Wash." It is undisputed that these third parties were under the impression, which was fostered by Tesch, that the Car Wash is sponsored by or affiliated with, the University. Based on the undisputed summary-judgment proof, the court finds that the Car Wash adopted its marks with the intent of deriving a benefit from the University's goodwill.

Further, the Car Wash does not dispute, nor can it, that the Car Wash trademarks and color scheme are similar to the University's. Tesch conceded that the Car Wash logo is "using a mark that's similar to the University's [tower marks]" and that the color on the logo, the Car Wash website, and signage is "a close resemblance to [the University's] orange." A comparison of the replica and the Car Wash logo with the University tower and the tower marks reveals that the parties' marks are highly similar, rendering confusion as to the University's sponsorship, affiliation, or connection with the Car Wash highly likely.

Having reviewed the summary-judgment proof and considered the factors for assessing the likelihood of confusion with regard to the sponsorship, affiliation, or connection of the Car Wash with the University, the court finds that the Car Wash's logo, the replica tower, and the color on the logo each reflect a great similarity to the marks used by the University. Although lacking is any similarity between the products or services each of the parties provides, it is undisputed that the Car Wash's intent was to benefit from the University's efforts and there exists proof of actual confusion as to the connection or affiliation of the University with the Car Wash. The court holds that the

University has established as a matter of law that there is a likelihood of confusion that the University is a sponsor of, affiliated with, or connected to the Car Wash.

### Does the alteration of the Car Wash impact the likelihood-of-confusion analysis?

After the University filed this action, the Car Wash altered the cupola of the tower replica. The University argues that the alteration has no bearing on the likelihood-of-confusion analysis. *See e.g., Chevron Chem. Co. v. Voluntary Purchasing Groups*, 659 F.2d 695, 705 (5th Cir. 1981) (citing *Kimberly Knitwear Inc. v. Kimberley Stores, Inc.*, 331 F. Supp. 1339 (W.D. Mich. 1971)). The *Kimberly Knitwear* court determined that defendants' modification to its mark during the pendency of the action had no impact on the court's finding of previous infringement, and held that the defendants' prior bad faith and intentional infringement was "relevant to it characterizing the second [mark] chosen by them." 331 F. Supp. at 1341.

Here, the court finds that the Car Wash's modification to the tower replica's cupola is insufficient to dispel the likelihood of confusion in the marketplace. The main portion of the tower replica has not been altered, and indeed the vast majority of the replica remains identical to the University tower, including its window scheme and exterior color. Additionally, Tesch acknowledges that the Car Wash retains the ability to bathe the tower replica in orange lighting, although that has not occurred to date. Further, Tesch stated that the original cupola, which is in storage, might be reinstalled at some time in the future. Tesch also has no plans to alter the Car Wash logo, which continues to prominently display an orange depiction of the University tower as the "T" in the word "Tower".

### *Conclusion with regard to University's infringement, unfair competition, and unjust enrichment claims*

The court finds that the University has met its burden and shown that there are no material facts in dispute regarding its federal trademark-infringement and unfair-competition claims, Texas trademark-infringement and unfair-competition claims, and unjust enrichment claims alleged against the Car Wash. Further, the court finds that the Car Wash has failed to introduce specific facts or produce summary-judgment proof which reveals that there remains a genuine dispute regarding a material fact as to these claims. The court will, therefore, grant the University's motion for summary judgment on its federal trademark-infringement and unfair-competition claims, Texas trademark-infringement and unfair-competition claims, and unjust enrichment claims alleged against the Car Wash.

**University's dilution claim**

The University alleges that the Car Wash's intentional duplication of the University tower and use of the tower marks has created a likelihood of dilution of its marks and seeks a permanent injunction. *See* Tex. Bus. & Com Code Ann. § 16.29 (West 2011) ("Section 16.29").[2] The University asks the court to permanently enjoin and restrain the Car Wash from using the tower replica, the Car Wash's logo, an orange color or lighting scheme in or on any new logo or tower structure and any other mark or tower structure that is confusingly similar to or likely to cause

---

[2]   A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15 [of the United States Code] or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods and services.

Tex. Bus. & Com. Code Ann. § 16.29 (West 2011).

dilution of the University's tower or the tower marks and from any attempt to retain any part of the goodwill misappropriated from the University. The University also requests the court to order that the Car Wash dismantle and destroy the tower replica; that the Car Wash file with the court and serve the University within 30 days of the date of judgment a written report under oath setting forth in detail the manner and form in which the Car Wash has complied with the dismantling and destroying of the tower replica.

The Car Wash responds that the University's state dilution claim should be rejected because the University has failed to use the Tower consistently as a trademark, therefore it is not a distinctive mark deserving protection under Texas law.

Section 16.29 offers broader protection for trademarks than does federal law, allowing injunctive relief, "regardless of whether there is competition between the parties or confusion as to the source of goods or services." *See Pebble Beach Co.*, 155 F.3d at 550. Injunctive relief may be granted only upon a showing of (1) existence of a wrongful act; (2) the existence of imminent harm; (3) the existence of irreparable injury; and (4) the absence of an adequate remedy at law." *See E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 279 (5th Cir. 2002); *Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001).

To succeed on a dilution claim, the University must show that it owns a distinctive mark and that there is a likelihood of dilution. *Spider Webs*, 286 SF.3d at 278. Dilution is considered likely where a defendant weakens the ability of a plaintiff's marks to act as unique identifiers. *Id.* at 278-79. Likelihood of dilution can be caused by either "(1) blurring, a diminution in the uniqueness or individuality of the mark, or (2) tarnishment, an injury resulting from another's use of the mark in a manner that tarnishes or appropriates the good will and reputation associated with the plaintiff's

17

marks." *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1081 (5th Cir. 1997) (citations omitted).

The University's tower marks are distinctive marks. It is undisputed that the Car Wash was developed to take advantage of the University's brand and goodwill developed over years in the tower marks. The Car Wash's use of the tower replica, the tower marks, and the orange color scheme damages the ability of the tower marks to act as unique identifiers of the University's products and services, and has weakened the University's ability to distinguish its products and services from those, like the Car Wash, that are unaffiliated third parties. The University has met its burden to show that if the Car Wash is allowed to retain the replica tower, the logo with the tower marks, or the ability to bathe the replica tower orange, it is likely that the University's marks will be diluted. Although the court is of the opinion that the University is likely entitled to the requested relief, the court will withhold a ruling on the appropriate remedy at this time.

**Conclusion**

The court holds that the University has established that it is entitled to summary judgment as a matter of law with regard to each of it claims alleged against the Car Wash.

**IT IS THEREFORE ORDERED** that Plaintiff Board of Regents, The University of Texas System's Plaintiff's Motion For Summary Judgment filed February 29, 2012 (Clerk's Document No. 36) is **GRANTED** as to liability.

**IT IS FURTHER ORDERED** that the parties meet and confer in an attempt to reach agreement on remedial steps to be taken by the Car Wash to comply with this order. This case is **SET FOR HEARING on the appropriate remedies to be awarded the University at 10:00**

**a.m., Thursday, June 21, 2012**, in Courtroom One, Second Floor, United States Courthouse, 200 West Eighth Street, Austin, Texas.

**IT IS FURTHER ORDERED** that the final pretrial conference previously set for June 29, 2012, and the jury trial set for July, 2012 in this cause are **CANCELLED.**

SIGNED this ___17th___ day of May, 2012.

```
                                    _____
                                    LEE YEAKEL
                                    UNITED STATES DISTRICT JUDGE
```